IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| STANLEY DRAKE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 09-C-6954 |
| vs. ) | Magistrate Judge Sidney I. Schenkier |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**[1]

In this administrative appeal, Stanley Drake ("Mr. Drake") seeks reversal and remand of a final decision by the Commissioner ("Commissioner") of the Social Security Administration ("SSA"). As of and subsequent to October 17, 2008, the Commissioner found Mr. Drake disabled based on his "advanced" age (55 years or older) by applying the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, and thus awarded supplemental security income ("SSI") to Mr. Drake beginning October 17, 2008. However, the Commissioner found Mr. Drake was not disabled prior to that date, and denied him SSI for the period January 9, 1993 through October 16, 2008. In this appeal, Mr. Drake challenges the denial of SSI from January 9, 1993 through October 16, 2008 (doc. # 16).[2] The Commissioner asks the Court to affirm the administrative decision, including the denial of SSI for the indicated period (doc. # 18). For the reasons discussed below,

---

[1]On March 5, 2010, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including the entry of final judgment (doc. ## 9, 11).

[2]Mr. Drake also requests that we reverse the portion of the final decision awarding SSI after October 17, 2008 pursuant to "Sentence four or, alternatively" with "instructions . . . for a new hearing," and "an opportunity to present additional evidence" (Reply at 4). The Court finds no factual, legal or logical basis for this request and so we deny it without further discussion.

this Court reverses and remands the portion of the Commissioner's final decision denying SSI prior to October 17, 2008.

I.

The procedural history of the present case is limited to the application for SSI filed by Mr. Drake on November 17, 2006, alleging January 9, 1993 as his onset date of disability (R. 210-13).[3] In this application, Mr. Drake claimed disability based on a seizure disorder and anxiety (R. 210). In the initial denial of this claim, the SSA interpreted the claim as asserting disability based solely on a seizure disorder (R. 72-75). However, at the administrative hearing before the ALJ, Mr. Drake argued that he was disabled due to additional impairments: epilepsy, depression, bi-polar syndrome, schizophrenia, headaches, pain in feet and legs, peptic ulcer disease, hypertension, a right kidney exophytic cyst and alcoholism (R. 6-58).

In a written opinion dated April 1, 2009, the ALJ addressed and analyzed these additional claims of impairment using the standard five-step evaluation required by 20 C.F.R. § 416.920(a) (R. 60-61). The ALJ found that, as of October 17, 2008, Mr. Drake was disabled due to epilepsy and seizure disorder, based on application of Medical-Vocational Rule 202.01, because he had reached the "advanced" age of 55 (R. 70). The ALJ found that Mr. Drake was not disabled prior to October 17, 2008, and thus denied SSI for any time prior to that date (R. 70). Mr. Drake appealed this partially favorable decision to the Appeals Council (R. 5), but the Commissioner denied the appeal on September 11, 2009 (R. 14). The denial made the ALJ's decision the final decision of the Commissioner (R. 1).

---

[3]The application at issue in this case is Mr. Drake's third request for SSI from the SSA. The first application was denied in July 2002 (R. 10). The second application was denied on May 23, 2003 (R. 10, 147-53).

2

## II.

Before review of the merits, we briefly summarize the legal standards governing appeals from the Commissioner's final decisions.

To establish a disability under the Social Security Act, 42 U.S.C. §§ 416(I), 423(a)(1)-(2)(A) and 1382c(a)(3)(A), a claimant must show the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." *Id.* § 423(d)(1)(A). A claimant must also show that the impairment prevents him or her from performing prior employment and any other job generally available in the national economy. *Id.* at § 423(d)(1)(A).

The social security regulations outline a five-step test for determining whether a claimant has a disability. The ALJ must consider: (1) whether the claimant is presently unemployed; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairments meet or equal any impairments listed in the regulations as being so severe as to preclude substantial gainful activity; (4) whether the claimant is able to return to past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy. 20 C.F.R. § 404.1520(a)(4).

While judicial review of an ALJ's decision "is deferential, it is not abject." *Parker v. Astrue,* 597 F.3d 920, 921 (7th Cir. 2010), a point the Seventh Circuit has emphasized in three rulings within the last month. *See, e.g., O'Connor-Spinner v. Astrue,* No. 09-4083, __F.3d__, 2010 WL 4812819, *3 (7th Cir., Nov. 29, 2010); *Spiva v. Astrue,* No. 10-2083, __F.3d __, 2010 WL 4923563, * 6 (7th Cir., Dec. 6, 2010); *Campbell v. Astrue,* No. 10-1314, __F.3d __, 2010 WL 4923566, * 6 (7th Cir.,

Dec. 6, 2010). We uphold an ALJ's decision if it is supported by substantial evidence; that is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Terry v. Astrue,* 580 F.3d 471, 475 (7th Cir. 2009) (internal citations and quotations omitted). Although the ALJ is not required to address every piece of evidence or testimony presented, the Court "cannot uphold an administrative decision that fails to mention highly pertinent evidence," or that "because of contradictions or missing premises fails to build a logical bridge between the facts of the case and the outcome." *Parker,* 597 F.3d at 921 (internal citations omitted).

### III.

The evidence relevant to the present claim is as follows.

Mr. Drake was born on October 17, 1953 (R. 15). Mr. Drake has a tenth grade education; he dropped out of high school in eleventh grade and does not have a GED (R. 15).

At the time of the administrative hearing, held on November 25, 2008, Mr. Drake had lived with his mother for two years and was receiving food stamps in the amount of $183.00 per month, but he had no other public assistance (R. 17). Prior to that time he had lived with a girlfriend (R. 17), and, for a period of time thereafter, he had been homeless, living in a shelter (R. 613).

Mr. Drake claims that he is able to take care of his personal needs, but he cannot live alone because he can no longer drive due to his medical condition, and he cannot care for his own medical needs (R. 24, 37, 250).[4] Mr. Drake indicated that he cannot obtain a new license because the medication he takes for seizures (*i.e.,* dilantin) causes him to lose focus and renders him unable to drive (R. 19). His mother currently drives him where he needs to go (R. 21). Moreover, Mr. Drake

---

[4] Mr. Drake has not had a drivers' license since 1970, when he was involved in an accident that was not related to his previous alcoholism or his medical conditions (R. 17-19).

4

can only walk short distances due to pain in his legs, as well as dizziness (R. 22, 24). Thus, Mr. Drake's daily activities include, *inter alia*, personal grooming, house work, cooking, lawn mowing, listening to the radio, watching television, and reading the newspaper (R. 20-24).

Mr. Drake's work history is as follows (R. 312). From 1973 to 1980, he worked at Schwinn Bicycles Company, where he unloaded delivery trucks. From 1981 to 1982, Mr. Drake worked as an assembly line worker. From 1985 to 1988, he worked as a housekeeper; and from 1990 to 1992 he worked as a stocker at a local restaurant. Mr. Drake's work history report indicates that he last worked sometime in 1992; his alleged disability onset date is January 9, 1993. The record is not clear as to when Mr. Drake ceased working at substantial gainful activity. However, the medical records indicate that, after having gastric surgery in October 1993, Mr. Drake was still seeking medical clearance to return to work (R. 326). Since that time, Mr. Drake claims to have applied for jobs, but with no success (R. 31).

Mr. Drake has an extensive medical history. In 1954, at the age of nine months, he suffered "trauma" that resulted in an unspecified "surgery" (R. 425); two other medical records refer to "brain surgery" (R. 588), and a craniotomy (R. 428). There follows a long gap of any evidence of medical history until 1992; thereafter, Mr. Drake's medical record is extensive. The earliest medical records from that time frame are from West Suburban Hospital, dated January 2, 1992 to January 9, 1993 (R. 344-73). Treatment notes by doctors from that hospital reflect the conclusion that Mr. Drake suffered gastrointestinal problems stemming from alcohol abuse prior to 1993. The doctors who performed a gastrointestinal surgery on Mr. Drake in 1993 recommended that he cease alcohol use/abuse and undergo alcoholism treatment at a half-way house in Maywood, Illinois, namely the "Way Back Inn" for detox (R. 325-28 (West Suburban Hospital Records dated 01/02/93)).

At the administrative hearing, Mr. Drake testified that he complied with this recommendation and he stopped using alcohol after treatment; moreover, both he and his mother testified that he has not consumed alcohol since that time (R 26-27; 39-40). However, some of the medical evidence speculates that Mr. Drake continued using alcohol after 1993 (*see, e.g.,* R. 450). Mr. Drake testified that the result of not drinking was anxiety; he testified that after he stopped drinking he would become so nervous that he had to take Risperdal, a prescription drug, for anxiety (Tr. 26, 29). And, indeed, the record reflects multiple prescriptions for and the continuous use of Risperdal from 1993 to the present (*See, e.g.,* R. 383, 403, 416, 472, 537, 581).

The medical evidence also indicates that Mr. Drake has a history of psychotic illness and depression. The medical records from Stroger Hospital track both conditions from October 2003 through August 2007 (R. 377-79 (copies from R. 550-89); 414; 550-89). In 2005, treatment records from Mt. Sinai Hospital indicate that Mr. Drake had a history of psychosis related to depression and schizophrenia (R. 428); in 2006, records from Stroger Hospital appear to diagnose depression (R. 574-76; 581); and, in 2007, there are multiple reports with diagnoses from both consulting and treating doctors describing conditions related to chronic paranoia (R. 416), paranoid schizophrenia (R. 419), mania and depression with possible bi-polar disorder (R. 551, 563).

In addition to Mr. Drake's treatment records, there are two written reports from medical doctors hired as consultants by the Bureau of Disability Determination Services ("DDS") to review Mr. Drake's claims. On February 28, 2007, Dr. Romi Sethi, M.D., of Physician Management Systems ("PMS"), issued a written report for DDS. Dr. Sethi noted that Mr. Drake reported having "a history of chronic paranoia, paranoid schizophrenia for six to seven years" which included hospitalization "at Madden Hospital [] six to seven times for schizophrenia" (R. 416). This history

was not based on Dr. Sethi's review of any medical documents. Dr. Sethi examined Mr. Drake physically but deferred a mental status examination to a psychiatrist. Based on neurologic findings, Dr. Sethi reported that Mr. Drake was able to produce sustain audible and understandable speech (R. 418). Dr. Sethi's "clinical impression" was that Mr. Drake suffered from "paranoid schizophrenia," for which he took medications and was seeing a psychiatrist soon (R. 418-19).

On March 5, 2007, Mr. Drake was examined by Dr. Henry Fine, M.D. Dr. Fine, also of PMS, issued a written report for the DDS (R. 421-24). In his report, Dr. Fine includes the medical history reported by Mr. Drake, which includes a history of schizophrenia for "about 4-1/2 years, with multiple, perhaps ten, hospitalizations at Madden State Hospital and maybe ten or so for psychiatric and medical reasons at Mt. Sinai" (R. 421). Dr. Fine noted that Mr. Drake also reported seeing things that were not there, hearing voices, not sleeping even with medications, and feeling generally confused (R. 421). Unlike Dr. Sethi, Dr. Fine did perform a mental status examination. Based on this examination, Dr. Fine reported that Mr. Drake was "not able to outline his history coherently at all." Dr. Fine noted that Mr. Drake's behavior was confused; and his mood was flat, with little range; and his affect was normal to content. Dr. Fine also observed that Mr. Drake's conversation was confused. While there was no evidence of delusions or hallucinations, testing was performed on Mr. Drake's memory, abstract and concrete reasoning skills and his judgment and insight. Based on the results of those tests and his examination and observation of Mr. Drake, Dr. Fine diagnosed Mr. Drake as having schizophrenia "NOS" (*i.e.,* "not otherwise specified"), as well as a history of seizure disorder (R. 424). Dr. Fine's diagnosis is consistent with the earlier diagnoses by various hospital doctors treating Mr. Drake in 2005, 2006 and 2007.

That said, there is a report by Dr. John Tomassetti, Ph.D, another consultant hired by DDS, which contradicts that evidence. Dr. Tomassetti is a psychologist, not a medical doctor. On April 17, 2007, Dr. Tomassetti completed a Psychiatric Review Technique Form ("PRTF") (R. 438-454), as well as a Mental Residual Functional Capacity Assessment Form ("MRFC") (R. 452-55), for Mr. Drake. It does not appear that Dr. Tomassetti examined Mr. Drake; instead, it appears that he merely reviewed the medical record and drew conclusions from the documents.

The PRTF assessment uses boxes in which the examiner checks off the findings made. Dr. Tomassetti found that Mr. Drake had medically determinable impairments that do not "precisely satisfy the diagnostic criteria" for: Listings 12.02 (Organic Mental Disorders); 12.04 (Affective Disorders); and 12.09 (Substance Addiction Disorders) (R. 439, 441, 446). With respect to the "B" criteria of listings 12.02 and 12.04, Dr. Tomassetti found that Mr. Drake was mildly limited in maintaining social functioning; was moderately limited in activities of daily living and had moderate difficulty in maintaining concentration, persistence or pace; and had one or two episodes of decompensation for extended durations – none of which satisfied the functional criteria under "B" for those Listings (R. 448). Dr. Tomassetti also concluded that the "C" criteria for Listings 12.02 and 12.04 were not established by the evidence (R. 449).[5]

In the PRTF, Dr. Tomassetti did not address whether Mr. Drake had an impairment that was present, but that did not precisely satisfy, the diagnostic criteria of Listing 12.03 (schizophrenia) (R.

---

[5] The "C" criteria that apply to Listing 12.04 (Affective), as well as Listing 12.03 (Schizophrenic), require evidence of: "Medically documented history of a chronic organic mental (12.02), schizophrenic, etc. (12.03), or affective (12.04) disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do any basic work activity, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: 1. Repeated episodes of decompensation, each of extended duration. 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate. 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement.

438,440). His notes on the PRTF do not explain the basis for that conclusion, but refer instead to the MRFC conclusions (R. 454). There, Dr. Tomassetti states: "3d party input for adaptive ability certainly does not support the presence of being psychotic in any way" (R. 454). Dr. Tomassetti goes further and states: "this clmt is not cognitively impaired and not schizophrenic (*Id.*).

In the MRFC, Dr. Tomassetti again evaluated Mr. Drake only with respect to Listings 12.02, 12.04 and 12.09 (R. 452-455). The MRFC considers four categories: (1) understanding and memory; (2) sustained concentration and persistence; (3) social interactions; and (4) adaptation (R. 452-53). Dr. Tomassetti found that Mr. Drake only had moderate limitations in two of these categories: understanding and memory, and sustained concentration and persistence (*Id.*). Although the MRFC does not state the significance of "mild," "moderate" and "marked" (R. 452-53), the PRTF states that a moderate limitation is not sufficient to establish the diagnostic criteria for a listed impairment; a marked limitation must be shown in one of the four categories to find that a claimant is disabled under a Listing (R. 448).

Mr. Drake also suffers from diagnosed epilepsy and seizures. At the end of the administrative hearing, Mr. Drake testified that he believes his first seizure occurred in 1991 (R. 32). However, the first reported diagnosis of epilepsy in the medical records appears in medical records from Stroger Hospital dated December 2005 (R. 327), and the first medical documentation of seizures occurred on January 20, 2006 (R. 580-82). After that time, however, the diagnosis of seizure disorder is consistent and chronic (R. 425-29 (Mt. Sinai Hospital); R. 524-49 (St. James Hospital); 550-89 (Stroger Hospital). The medical evidence further reflects a continuing prescription of Dilantin for these seizures (*see, e.g.,* R. 551, 572-575). Dilantin controls the seizures when Mr. Drake takes the medications (R. 28); but, the seizures are uncontrolled when he does not (R. 30).

9

## IV.

We begin the analysis with a single observation: the five step sequential evaluation is an orderly set of analytical steps the ALJ must follow to determine whether a claimant is disabled. Each subsequent step builds on the preceding steps. A significant error at a preliminary step means that the analysis must stop at that step and be redone. As we explain below, that is what happened here at Step Two and Step Three. Below we identify the specific questions the ALJ needs to address on remand at Step Two (Part A) and Step Three (Part B).

### A.

We will begin the analysis with the Step Two error. At Step Two, the ALJ must determine whether a claimant has a severe impairment. A finding of a severe impairment establishes the framework for the analysis at Step Three. An error at Step Two in determining a claimant's severe impairments thus can result in an error at Step Three (R. 63).

At Step Two, the ALJ found:

> the claimant has also been diagnosed with depression. He has a history of chronic paranoia, and paranoid schizophrenia. He has seen a psychiatrist (Exhibit(s) 4F, 11F, and 14F).

(R. 63). The ALJ concluded that the diagnosis of depression constitutes a severe impairment (although he does not say why); but, the ALJ says nothing more about the evidence of chronic paranoia and paranoid schizophrenia. The ALJ therefore must have found – without so stating – that they were not severe impairments. But, the ALJ offered no explanation for why this is so.

Although there is some evidence that Mr. Drake may not suffer from schizophrenia (one psychological, not medical, opinion by Dr. Tomassetti), there is a substantial amount of medical evidence to support Mr. Drake's claim that he has paranoid schizophrenia. For example, there are

10

a number of medical records from Stroger Hospital between October 15, 2003 and August 15, 2007 which indicate that Mr. Drake suffers from psychotic illness (R. 550-589). This time period covers the period for which SSI was denied by the ALJ. In particular, we note the medical reports at R. 491 (psychotic problems, mania, hallucinations); 551 (mania, possible bi-polar); 558 (psychosis); 562 (depressed with mania, possible bi-polar); 573 ("bizarre behavior"; history of admission to psychiatric hospital); 603 (psychotic symptoms; noted homelessness and living in a shelter off psychiatric medications). There are also two written reports from consulting doctors hired by the DDS who examined Mr. Drake (R. 416-24) and who concluded that one of Mr. Drake's diagnoses was paranoid schizophrenia (R. 419, 424).

We do not say that the ALJ must find that this evidence establishes chronic paranoia and/or paranoid schizophrenia as severe impairments, and must reject the contrary evidence offered by Dr. Tomassetti. But, the ALJ cannot simply reject those conditions as severe impairments without explaining why.

For example, we are left in the dark as to why, if the ALJ decided to accept Dr. Tomassetti's conclusions, the ALJ considered those conclusions more persuasive than the assessment by Dr. Fine, another DDS examiner, who reached contrary conclusions after conducting an in-person examination of Mr. Drake. This is especially troubling given that Dr. Fine issued his Psychiatric Evaluation on March 5, 2007 (R. 421-424), only 43 days before Dr. Tomassetti completed the PRTF and MRFC on April 17, 2007 (R. 438-455). Nor does the ALJ explain why Dr. Tomassetti's conclusions should trump the conclusions of treaters who saw Mr. Drake. An ALJ "must offer 'good reasons' for

discounting a treating physician's opinion." *Campbell,* 2010 WL 4923566, at * 6. Here, the ALJ offered no reasoning at all on this critical point.[6]

The question of whether Mr. Drake has a severe impairment of paranoid schizophrenia is too important to be glossed over as the ALJ does in his opinion. A severe impairment of paranoid schizophrenia would significantly limit Mr. Drake's work-related functioning. *See* 20 C.F.R. § 416.920(c). In order to fulfil the minimal articulation requirement, on remand the ALJ must explain what findings he makes – and why he makes them – on the issue of whether at Step Two Mr. Drake has a severe impairment.

**B.**

Next, we address Step Three. We find the ALJ committed two errors that require remand.

**1.**

The ALJ's failure to properly address whether paranoid schizophrenia is a severe impairment at Step Two affects the integrity of the Step Three analysis. If, in fact, Mr. Drake has a severe impairment of paranoid schizophrenia, that requires an analysis of Step Three of whether that impairment would meet or equal Listing 12.03 at Step Three. That is an analysis the ALJ failed to perform.

**2.**

At Step Three, the ALJ found that, although Mr. Drake's depression was a severe impairment at Step Two, that condition failed to meet or equal Listing 12.02 or 12.04. The ALJ found that "claimant's depressive disorder does not satisfy the "B" criteria required to meet or medically equal

---

[6]The ALJ's later reference to the report of Dr. Tomassetti at Step Five is not sufficient to cover for the failure to minimally articulate and address the medical evidence relevant at Step Three. *See Rice v. Barnhart,* 384 F.3d 363, 370 n.5 (7th Cir. 2004).

12

any medically determinable mental impairment(s) identified in Section 12.00 of the Listing of Impairments," because "the medical evidence of record does not support a finding that the claimant experiences any marked functional limitations in his activities" in any of the relevant ways (R. 64). The ALJ offers no elaboration and no explanation as to how he reached that conclusion.

That is a significant shortcoming, because the ALJ's statement of conclusions fails to come to grips with the medical evidence of mania and possible bipolar disorder, evidence that could satisfy not only the "B" criteria of Listing 12.04 (R. 448), but also the "C" criteria for Listing 12.04 (R. 449), the alternative basis upon which to establish a disability if the "B" criteria are not satisfied.

For example, in both early (R. 580) and late (R. 491) 2006, there are handwritten (almost illegible) clinical notes from medical examiners at Stroger Hospital who report that Mr. Drake has a history of psychotic illness and diagnose Mr. Drake with the same. In the late 2006 notes, the consultant states that Mr. Drake gave a history of mania and crying, with depression. The diagnosis appears to be psychotic disorder (R. 491) in one pen but depression by another pen (R. 492). In April 2007, there is an emergency room intake form indicating that Mr. Drake gave a history of being depressed with mania and had trouble sleeping. The examiner also observed a depressed affect with an effect on the content and rate of speech (R. 562). The examiner noted a past medical history of depression with a question mark next to bipolar disorder (R. 562). The examiner gave Mr. Drake the same diagnosis at that time. In November 2007, there is another emergency room intake form indicating that Mr. Drake gave a history of mania but did not "recognize 'bipolar' diagnosis" (R. 551). The diagnosis by this doctor was "bipolar disorder-possible" (R. 552).

The ALJ not only fails to discuss the evidence of those conditions (*see, e.g.,* R. 491, 551 and 562) – conditions which might satisfy Listing 12.04 and establish disability in favor of Mr. Drake

13

– but he also, in fact, finds that the evidence in the record does not establish the presence of any "C" criteria. As we read the PRTF, the evidence summarized above could support a finding that Listing 12.04 was met using the "C" criteria, but the ALJ does not explain why the evidence of mania and bi-polar disorder in the record does not satisfy these criteria. This evidence cannot be ignored because it is material to the determination of disability.

On remand, the Court instructs the ALJ to examine the medical record more closely with respect to Listing 12.04, and to explain how the evidence of mania and possible bi-polar disorder cuts with respect to Mr. Drake's claim of disability at Step Three.

V.

Before concluding, the Court addresses plaintiff's argument that the credibility determination by the ALJ is "patently wrong" (Pl.'s Mem. at 2; Reply at 3-4). In so doing, the Court focuses on the following statement made by the ALJ:

> I have taken the reports of the claimant's mother and friend in consideration in assessing the claimant's residual functional capacity. Although the reports [of] witnesses are generally corroborative of the claimant's allegations, and have been duly considered, the close relationship between the witnesses and the claimant and the possibility that the reports were influenced in favor of the claimant by a desire to help the claimant cannot be entirely ignored in deciding how much weight it deserves.

(R. 66). This statement is problematic for several reasons.

*First*, having called into question the credibility of Mr. Drake's mother and friend, the ALJ fails to explain "how much weight it deserves." We are left in the dark as to whether the ALJ discounted that testimony entirely, or gave it diminished weight – and if so, how diminished. This failure of articulation flies in the face of well settled authority, *Parker*, 597 F.3d at 921, and if

accepted would deprive the Court of the tools it needs in order to discharge the review function of determining whether the credibility determination was "patently wrong."

*Second*, we question whether the mere relationship between a claimant and his witnesses – without more – is a sufficient basis on which to decide that the witnesses are not credible. For any witness to be in a position to offer relevant evidence, the witness likely will have some level of relationship with the claimant. That relationship is what will enable the witness to offer evidence about the claimant's daily activities. Under the approach that the ALJ appears to espouse, claimants should not bother to call the witnesses in the best position to offer evidence about the claimant's condition, because their testimony will be automatically discounted – or rejected – merely because of their relationship to the claimant.

*Third*, relying simply on a witnesses relationship in deciding credibility ignores the reason that an ALJ's properly explained credibility determination is given great deference. The ALJ has the opportunity to assess witnesses in a way that a reviewing court using a cold record cannot. The ALJ can assess not only what the witness says, but the witness's demeanor, tone of voice, and other cues that fact finders routinely assess in making credibility determinations. But, if an ALJ makes credibility determination based on the mere status of the witness, that is not a consideration that is uniquely within the province of a fact finder – a reviewing court, no less than an ALJ, can tell from the record the relationship between the parties. In our view, for the ALJ's credibility determination to be entitled to deference, it must not only meet the minimal articulation standard, but must be based on factors beyond mere relationship between the witnesses and the claimant.

On remand, the ALJ should take into consideration this guidance in making any credibility determinations.

## CONCLUSION

For the reasons given above, the Court grants Mr. Drake's motion for reversal and remand doc. # 16) and denies the Commissioner's motion for summary affirmance (doc. # 18).[7]

**ENTER:**

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**Dated: December 27, 2010**

---

[7] In light of our ruling, we do not address the challenges plaintiff raises to the findings at Steps Four and Five.